1

2

3

4

5

6

7

8                           UNITED STATES DISTRICT COURT

9                      FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   STEPHANIE N. ERENDS,                          No.  2:12-cv-2603-CKD

12                    Petitioner,

13        v.                                        ORDER

14   D.K. JOHNSON,

15                    Respondent.

16

17        Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas corpus

18   pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury of first degree murder with a

19   lying-in-wait special circumstance and a deadly weapon enhancement.   She claims that: 1) the

20   trial court erred in denying her request to modify a jury instruction regarding voluntary

21   manslaughter in violation of due process; 2) the trial court admitted an officer's opinion on the

22   veracity of petitioner's confession in violation of due process; 3) the prosecutor suppressed

23   toxicology reports that would have helped the defense in violation of due process; and 4) she

24   received ineffective assistance of counsel at the trial level because trial counsel failed to

25   investigate and present evidence of petitioner's diminished capacity violating her Sixth

26   Amendment right to assistance of counsel.[1]  (ECF No. 20.)  Respondent has filed an answer.

27   ─────────────────

28   [1]  Petitioner asserted a fifth claim for relief—that the trial court ordered her to pay restitution
     without taking into account her ability to pay.  The court previously concluded that this claim "is

1

(ECF No. 31.)  Upon careful consideration of the record and the applicable law, the court denies the second amended petition.[2]

BACKGROUND

I.    Facts

In affirming the judgment on appeal, the California Court of Appeal for the Third Appellate District set forth the relevant factual background as follows:

> Defendant and Alicia Ernst had been friends since high school. On March 7, 2008, it was defendant's 25th birthday. Defendant left home around 8:15 p.m. to celebrate with Ernst. Ernst and defendant visited Ernst's boyfriend, Richard Hamman, around midnight, leaving at 4:00 a.m.

> Ernst's body was discovered by a Placer County road maintenance worker off Old Walerga Road near Baseline Road on March 10, 2008. Her body was covered with trash, and an empty ammonia bottle was at the scene. There was no insect activity on Ernst's body, which was consistent with ammonia being poured over the body. The ammonia bottle tested positive for blood. Also found at the scene was a white plastic trash bag containing fresh blood, gloves saturated with blood, a knife-like device with a four-inch blade and a triangle-shaped area where the handle was broken off.

> The Placer County forensic pathologist determined Ernst died in the early morning hours of March 8, 2008. She sustained various sharp-force injuries to the head and face, but the cause of death was multiple sharp-force wounds to the neck. The neck wounds were from the left to the right, and were consistent with having come from a single-edged razor type of tool. There were also postmortem wounds on Ernst's fingers that were consistent with someone trying to shave off her fingerprints.

> Ernst sustained limited defensive wounds. More defensive wounds would be expected if she had been attacked from the side or front, and her other wounds were consistent with an attack from the rear. However, the pathologist could not conclusively determine the direction of the attack unless he was present during the assault.

> Around 5:00 a.m. on March 8, 2008, defendant knocked on the door of Michelle and Paul White's house. Defendant, who had blood all

---

not cognizable on federal habeas review as it does not affect the fact or duration of petitioner's sentence." (ECF No. 22, at 2 (citing Calderon v. Ashmus, 523 U.S. 740, 747 (1998); United States v. Thiele, 314 F.3d 399, 400 (9th Cir. 2002).)  As such, the court addresses claims one through four of the Second Amended Petition.

[2] The parties have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c) and Local Rule 302 (ECF Nos. 21 and 25).

2

over her hands, told the Whites that three men attacked her when her car broke down. She did not want law enforcement called, but asked to call her grandmother. Paul White later drove defendant to her grandmother's house.

Michael Smith responded to a tow service call on Old Walerga Road on March 8, 2008, at around 7:30 a.m. Defendant was there with her grandmother; the car was tangled in barbed wire and under an oak tree. Defendant said she and her girlfriend were run off the road by another vehicle. This did not make sense to Smith given the placement of defendant's car. Smith noticed blood on the driver's side door as well as between the seat and center console.

Defendant was contacted by Placer County Sheriff's Detective Christina Woo at around 9:10 p.m. on March 10, 2008. Defendant told Detective Woo she went to a bar with Ernst on March 7, her birthday. Ernst did not want to leave the bar, so defendant left Ernst and went to other bars by herself. She went home for awhile before going to a friend's house, where defendant left around 3:00 a.m., and was run off the road around 4:00 a.m. Defendant went to three to four houses looking for a ride before the Whites opened their door to her.

Defendant took Detective Woo and Detective Don Murchison to the bars she allegedly visited, and to where her car got stuck. She claimed another car ran her off the road, and a man came up and grabbed her by the neck. He later "slipped away" when another car drove past.

Told that Ernst's body was found in the same area, defendant suggested it was a coincidence. She then denied killing Ernst and demanded to be taken home. The detectives took defendant home and arrested her after seeing her car.

Detectives Murchison and Woo interrogated defendant at the Placer County Jail at 9:57 p.m. on March 11. After being read her *Miranda*[N.1] rights, defendant said she wanted "to confess to killing Alicia Ernst," and admitted slitting Ernst's throat with a "single razor."

[N.1] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694].

Defendant told the detectives she picked up Ernst and they did some methamphetamine at Hamman's house, leaving at around 3:30 a.m. Instead of going home, defendant drove Ernst to the frontage road. While Ernst was sitting in the front passenger seat, defendant got in the back seat and said she was going to change her pants. Defendant took a knife she had already placed in the back seat, and used it to slit Ernst's throat. She then pulled Ernst out of the car and cut off her fingerprints as much as she could. Once outside the car, defendant poured ammonia over Ernst's body and covered it with garbage. Defendant started to leave, but panicked and drove her car into a bush. She later convinced Paul White to drive her home.

Defendant admitted buying the ammonia and the blade several weeks before, intending to use them on Ernst. Defendant wanted to kill Ernst for allegedly pouring "acid" down her throat while she was sleeping six to seven months before the killing.

Defendant admitted her earlier story was false. She later helped the detectives find the ammonia bottle and the weapon.

Detective Murchison testified that he thought defendant held back some information in her confession. Although defendant claimed she had not been to the murder scene before she killed Ernst, defendant's boyfriend told Detective Murchison that he and defendant had been to the area before. He also could not confirm whether Ernst poured acid down defendant's throat. However, Detective Murchison believed most of the confession was corroborated by extrinsic evidence, such as bloodstains in defendant's car.

A search of defendant's car found red stains on both the driver-and passenger-side doors, along with gouges and scratches on the roof and hood. There was blood on the steering wheel and the interior of the car, including extensive saturated bloodstains in the lower left quadrant of the passenger's seat, and two shoe prints were on the interior windshield.

Defendant's boyfriend, Alexander Kapustin, was arrested on an outstanding warrant when he tried to visit defendant in jail. Kapustin had a newspaper clipping on defendant's case, along with a note that he intended to pass to defendant. The note read, "Tell me you don't [sic] do that because you still think I was mess-mess around with her." Kapustin testified that he fought with defendant about whether he slept with Ernst, which he denied.

Hamman testified that defendant and Ernst knocked on his door on the night of March 7, 2008. Hamman was dating Ernst at the time, and once dated defendant. Defendant and Ernst asked Hamman if he had any drugs. Hamman said "No," and they left after 30 minutes. Ernst and defendant returned at around 1:30 or 2:00 a.m. with methamphetamine, which they smoked in Hamman's garage.

Ernst and defendant teased and flirted with each other; at one point defendant got on Ernst's lap. Later, the three watched an adult movie, after which Ernst and Hamman went to the shower where they had sex. Ernst told defendant she watched her have sex with other men when they lived together. Defendant's demeanor did not change after Ernst said this. Ernst and defendant left at 4:00 a.m.

Defendant testified that she had been friends with Ernst since they were 13. On the night of the incident, defendant and Ernst went out to celebrate defendant's birthday. After buying some gas and beers, they went to Hamman's to buy some drugs. Hamman did not have any drugs, but they hung out for awhile before driving to see one of Ernst's friends, from whom Ernst bought methamphetamine. They stayed at the friend's house for a few hours and smoked methamphetamine.

The pair then returned to Hamman's house, where they hung out for a few hours and smoked methamphetamine. The three watched an adult video; at some point Ernst and Hamman took a shower. Ernst started making rude remarks about defendant and pulled down one of defendant's pant legs, exposing her underwear. Ernst said she had seen defendant have sex with other people before; defendant looked foul doing so, and slept with a lot of other people. This made defendant "feel like crap," as it was defendant's birthday and Ernst was supposed to be her friend. Ernst kept insulting defendant even after defendant told her to stop.

Defendant then said she needed to get her keys from her grandmother, and Ernst suggested she go with defendant. Ernst seemed to feel bad for what she said, so defendant let Ernst come with her. Since she was high, defendant did not want to get home until her grandmother left for work, and she drove to an isolated spot on Old Walerga Road to wait for about 20 minutes. Defendant asked Ernst why she treated her that way; Ernst tried to laugh it off and thought it was funny, which made defendant feel dirty. Defendant told her to "shut up" and hit Ernst in the face.

Ernst got mad, and they started to fight. Defendant pulled Ernst's sweatshirt hood over Ernst's head, reached into a storage area of the driver's seat, grabbed a scraper, and pressed it onto Ernst. Ernst's feet were over the dash as they struggled. Ernst tried to get defendant off of her, and they fell out the passenger-side door.

Ernst stopped struggling at some point. Defendant slid the scraper across Ernst's fingers, got ammonia from the back seat, and poured the ammonia over Ernst's body. She put her gloves and the scraper into a plastic bag. Defendant put garbage on top of Ernst's body and tried to leave, but got stuck.

Defendant testified that when the detectives first spoke to her, they questioned her about being attacked so she went along with the story even though it was not true. Her confession was false; she felt like she was blaming Ernst if she told the deputies the truth, and defendant originally felt she deserved the death penalty.

Defendant claimed she kept the ammonia, trash bags, and rubber gloves in her car because she cleaned houses once a month. She purchased the scraper from Home Depot to scrape lettering off a door at her work. Defendant admitted arguing with Kapustin about sleeping with an Alicia, but later determined it was a different woman than Ernst.

Ellen Kuykendall, a close friend of defendant's grandmother, testified that defendant cleaned her house at times and would bring ammonia and gloves. According to a coworker of defendant's, their workplace purchased a new door and employees removed the door's old lettering. She admitted there were tools on-site for the task and did not recall a shaver being used.

/ / /

According to forensic psychologist Dr. Ari Kalechstein, defendant suffered from methamphetamine addiction and a major depressive disorder at the time of the incident, and was suffering from posttraumatic stress disorder (PTSD). Giving a different version of a traumatic event a few days after the event was consistent with PTSD, and the person's ability to recall or be aware of their surroundings and what transpired is affected.

On rebuttal, Detective Murchison testified that defendant's failure to admit certain facts did not cause him to question her confession. Holding back or not admitting information can happen during questioning. Murchison had been trained to look at the totality of the evidence when evaluating the veracity of a confession. There were no injuries on defendant's face consistent with defendant's testimony that Ernst grabbed her face with both hands. Also, defendant's testimony regarding a struggle outside the car was inconsistent with the staining found inside defendant's car. Defendant's testimony had not changed his belief that her confession was accurate.

People v. Erends, 2011 WL 2519208, at **1–4 (Cal. App. 3 Dist. June 16, 2011).

II.    Procedural History

On December 9, 2009, following a jury trial in the Placer County Superior Court, petitioner was found guilty of first-degree murder with a lying-in-wait special circumstance and a deadly weapon enhancement.  Erends, 2011 WL 2519208, at *1.  Petitioner was ultimately sentenced to life in prison without the possibility of parole plus one year.  Id.  On direct appeal, the California Court of Appeal for the Third Appellate District affirmed the judgment.  Id. at *8. Petitioner filed a petition for review with the California Supreme Court, which was summarily denied on September 14, 2011.  (Resp't's Lod. Docs. 5, 6.)

On September 11, 2012, petitioner's petition for writ of habeas corpus, filed in the Placer County Superior Court, was denied. (Resp't's Lod. Doc. 8.)  Petitioner then initiated the instant proceeding filing her initial federal habeas petition on September 26, 2012.  (ECF No. 1.)  She then filed a petition for writ of habeas corpus with California Court of Appeal, which was denied without comment or citation.  (Resp't's Lod. Docs. 9, 10.)

On March 1, 2013, petitioner filed a motion to stay this proceeding so that she could exhaust her claims in state court.  (ECF No. 14.)  The court granted this motion and stayed the action.  (ECF No. 17.)  Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied without comment or citation.  (Resp't's Lod. Docs. 11, 12.)

Petitioner then filed her second amended federal habeas petition.  (ECF No. 20.)  The court lifted

the stay and respondent filed an answer.  (ECF No. 22, 31.)

ANALYSIS

I.  <u>AEDPA</u>

The statutory limitations of federal courts' power to issue habeas corpus relief for persons

in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

2254(d) does not require a state court to give reasons before its decision can be deemed to have

been 'adjudicated on the merits.'"  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011).  Rather,

"when a federal claim has been presented to a state court and the state court has denied relief, it

may be presumed that the state court adjudicated the claim on the merits in the absence of any

indication or state-law procedural principles to the contrary."  <u>Id.</u> at 784–785, citing <u>Harris v.

Reed</u>, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

whether a decision appearing to rest on federal grounds was decided on another basis).  "The

presumption may be overcome when there is reason to think some other explanation for the state

court's decision is more likely."  <u>Id.</u> at 785.

The Supreme Court has set forth the operative standard for federal habeas review of state

court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

application of federal law is different from an incorrect application of federal law.'"  <u>Harrington</u>,

131 S. Ct. at 785, citing <u>Williams v. Taylor</u>, 529 U.S. 362, 410 (2000).  "A state court's

7

1    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

2    jurists could disagree' on the correctness of the state court's decision." Id. at 786, citing

3    Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

4    determine what arguments or theories supported or . . . could have supported[] the state court's

5    decision; and then it must ask whether it is possible fairminded jurists could disagree that those

6    arguments or theories are inconsistent with the holding in a prior decision of this Court." Id.

7    "Evaluating whether a rule application was unreasonable requires considering the rule's

8    specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

9    case-by-case determinations.'" Id.  Emphasizing the stringency of this standard, which "stops

10   short of imposing a complete bar of federal court relitigation of claims already rejected in state

11   court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

12   mean the state court's contrary conclusion was unreasonable." Id., citing Lockyer v. Andrade,

13   538 U.S. 63, 75 (2003).

14          The court also finds that the same deference is paid to the factual determinations of state

15   courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct subject

16   only to a review of the record which demonstrates that the factual finding(s) "resulted in a

17   decision that was based on an unreasonable determination of the facts in light of the evidence

18   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

19   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

20   factual error must be so apparent that "fairminded jurists" examining the same record could not

21   abide by the state court factual determination.  A petitioner must show clearly and convincingly

22   that the factual determination is unreasonable. See Rice v. Collins, 546 U.S. 333, 338 (2006).

23          The habeas corpus petitioner bears the burden of demonstrating the objectively

24   unreasonable nature of the state court decision in light of controlling Supreme Court authority.

25   Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

26   court's ruling on the claim being presented in federal court was so lacking in justification that

27   there was an error well understood and comprehended in existing law beyond any possibility for

28   fairminded disagreement." Harrington, 131 S. Ct. at 786–87.  "Clearly established" law is law

8

1   that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van Patten,

2   552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not qualify

3   as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established law not

4   permitting state sponsored practices to inject bias into a criminal proceeding by compelling a

5   defendant to wear prison clothing or by unnecessary showing of uniformed guards does not

6   qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).

7   The established Supreme Court authority reviewed must be a pronouncement on constitutional

8   principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

9   binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

10      The state courts need not have cited to federal authority, or even have indicated awareness

11   of federal authority in arriving at their decision.  Early, 537 U.S. at 8. Where the state courts have

12   not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will

13   independently review the record in adjudication of that issue.  "Independent review of the record

14   is not de novo review of the constitutional issue, but rather, the only method by which we can

15   determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson,

16   336 F.3d 848, 853 (9th Cir. 2003).

17      "When a state court rejects a federal claim without expressly addressing that claim, a

18   federal habeas court must presume that the federal claim was adjudicated on the merits – but that

19   presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

20   1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

21   was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

22   the claim.  Id. at 1097.

23   II.   Petitioner's Claims

24      A.   Jury Instruction

25      Petitioner contends the trial court committed prejudicial instructional error when it denied

26   her request to modify the standard jury instruction regarding voluntary manslaughter, CALCRIM

27   No 570.  Petitioner raised this claim on direct appeal and the California Court of Appeal rejected

28   petitioner's claim reasoning as follows:

Defendant contends the trial court prejudicially erred in failing to give a requested clarifying instruction on provocation. We disagree.

The trial court instructed the jury with the standard instruction on voluntary manslaughter, CALCRIM No. 570, which reads, in pertinent part: "A killing that would otherwise be murder is reduced to voluntary manslaughter if the defendant killed someone because of a sudden quarrel or in the heat of passion." CALCRIM No. 570 further states, "It is not enough that the defendant was simply provoked. The defendant is not allowed to set up her own standard of conduct. In deciding whether the provocation was sufficient, consider whether a person of average disposition in the same situation and knowing the same facts, would have reacted from passion rather than from judgment."

Before and after the trial, defense counsel asked the court to modify CALCRIM No. 570, based on the Bench Notes to CALCRIM No. 570 and *People v. Najera* (2006) 138 Cal.App.4th 212 (*Najera*), to include language that the sufficient provocation for manslaughter is not to kill but merely to act rashly and without deliberation. Asked how he would change the instruction, defense counsel stated, "I would just add that line that they put in the use notes, that an average person need not be provoked to kill, but merely to act [rashly] and without deliberation." The trial court rejected the suggested modification and instructed the jury with the unmodified CALCRIM No. 570 (Dec.2008 rev.).

Defendant relies on the Authority subheading to CALCRIM No. 570, which states: "'Average person' Need Not Have Been Provoked to Kill, Just to Act Rashly and Without Deliberation. *People v. Najera* (2006) 138 Cal.App.4th 212, 223." (Judicial Council of Cal.Crim. Jury Instns. (2011) Authority to CALCRIM No. 570, p. 354.) Admitting CALCRIM No. 570 "may be adequate for most cases generally," defendant asserts "the instruction's focus is misleading in regard to the concept of provocation which is not directly related to killing but to the loss of objectively normal mental control of an average person." Since "provocation 'to kill' "was not the main part of the defense, defendant argues it "was critical that the jurors understood that the provocation had only to be sufficient to arouse that heat of passion mental state to a level where the action of an ordinary person would be from passion rather than reason."

During argument on the motion at trial, the prosecutor sought clarification, stating that his understanding of defense counsel's position was that based on statements from Ernst in the car, coupled with the fight, there "was sufficient provocation for [defendant] to then grab the razor and kill her[.]" Defense counsel replied, "No. It's sufficient provocation for her to act rationally from passion. That's why I want the language, because even you are misreading what it says." Defendant contends this exchange shows the modified instruction was necessary to prevent the jury from believing defendant had to have been provoked to kill before finding sufficient provocation for voluntary manslaughter.

When a defendant contends an instruction is ambiguous or potentially misleading, we must review the instructions as a whole and determine "'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way' that violates the [United States] Constitution." (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 399]; *see also People v. Smithey* (1999) 20 Cal.4th 936, 963.)

"'[H]eat of passion'" voluntary manslaughter requires proof of provocation and heat of passion. (*People v. Lee* (1999) 20 Cal.4th 47, 59.) The provocation must be caused (or reasonably believed by the defendant to have been caused) by the victim, and must be "sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection." (*Ibid.*) If an "ordinarily reasonable person," so provoked, would have acted in this manner, there is legally sufficient heat of passion to reduce murder to voluntary manslaughter. (*Ibid.*)

*Najera* addressed a prosecutor's closing arguments containing numerous incorrect statements of the law regarding voluntary manslaughter. (*Najera*, *supra*, 138 Cal.App.4th at pp. 219–224.) Among the erroneous arguments were the comments, "'Would a reasonable person do what the defendant did?'" and "'[T]he reasonable, prudent person standard ... [is] based on conduct, what a reasonable person would do in a similar circumstance.'" (*Id.* at p. 223, italics omitted.) Such statements were incorrect because "[t]he focus is on the provocation—the surrounding circumstances—and whether it was sufficient to cause a reasonable person to act rashly. How the killer responded to the provocation and the reasonableness of the response is not relevant to sudden quarrel or heat of passion." (*Id.* at p. 223.)

CALCRIM No. 570 does not contain the gross misstatements of the law addressed in *Najera*. Instead of focusing on defendant's acts, CALCRIM No. 570 instructs the jury to consider whether a reasonable person, "knowing the same facts would have reacted from passion rather than from judgment." This is a correct statement of the law, and it is not reasonably likely that a jury instructed in this manner would apply the instruction incorrectly. The prosecutor's misstatement, made in the heat of argument, does not mean that a jury would make the same mistake when instructed with the unambiguous language of CALCRIM No. 570. It was not error for the trial court to refuse to give the modified instruction requested by defendant.

Erends, 2011 WL 2519208, at **4–6.

A challenge to a jury instruction solely as an error of state law does not state a claim cognizable in a federal habeas corpus action. See Estelle v. McGuire, 502 U.S. 62, 71–72, 112 S. Ct. 475, 116 L.Ed.2d 385 (1991) (habeas corpus is unavailable for alleged error in the interpretation or application of state law); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir.

11

1   1983); Middleton v. Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985).  The standard of review for a

2   federal habeas court "is limited to deciding whether a conviction violated the Constitution, laws,

3   or treaties of the United States."  Estelle, 502 U.S. at 62.  In order for error in the state trial

4   proceedings to reach the level of a due process violation, the error had to be one involving

5   "fundamental fairness."  Id. at 73.  The Supreme Court has defined the category of infractions that

6   violate fundamental fairness very narrowly.  Id.

7           To that end, petitioner must show both a defect in the instructions and a "reasonable

8   likelihood" that the jury applied the instruction in a way that violates the Constitution, such as

9   relieving the state of its burden of proving every element beyond a reasonable doubt.

10   Waddington v. Sarausad, 555 U.S. 179, 190–91, 129 S. Ct. 823, 831, 172 L.Ed.2d 532 (2009).

11   Petitioner must show that the ailing instruction by itself so infected the entire trial that the

12   resulting conviction violates due process.  Estelle, 502 U.S. at 72.  Additionally, the instruction

13   may not be judged in artificial isolation, but must be considered in the context of the instructions

14   as a whole and the trial record.  Id.  The court must evaluate jury instructions in the context of the

15   overall charge to the jury as a component of the entire trial process.  See United States v. Frady,

16   456 U.S. 152, 169, 102 S. Ct. 1584, 71 L.Ed.2d 816 (1982).  Furthermore, even if it is determined

17   that the instruction violated the petitioner's right to due process, a petitioner can only obtain relief

18   if the unconstitutional instruction had a substantial influence on the conviction and thereby

19   resulted in actual prejudice under Brecht v. Abrahamson, 507 U.S. 619, 637, 113 S. Ct. 1710, 123

20   L.Ed.2d 353 (1993).  See Hedgpeth v. Pulido, 555 U.S. 57, 61–62, 129 S. Ct. 530, 172 L.Ed.2d

21   388 (2008) (per curiam).

22           Petitioner repeats the arguments she made on her state court direct appeal here in her

23   federal petition.  She contends the trial court should have modified CALCRIM 570 to clarify that

24   "sufficient provocation for manslaughter is not to kill but merely to act rashly and without

25   deliberation."  The trial court declined to modify the instruction because CALCRIM 570 as

26   written was not an inaccurate statement of the law.  5 RT 1467.  Petitioner concedes that

27   CALCRIM No. 570 is not inaccurate but contends that it is misleading.

28   ///

1    Based on its analysis and interpretation of CALCRIM No. 570, <u>People v. Najera</u>, 139

2    Cal.App.4th 212 (2006), and <u>People v. Lee</u>, 20 Cal.4th 47, 59 (1999), the state appellate court

3    found that CALCRIM 570 is not ambiguous and is a correct statement of state law.  "A state

4    court's interpretation of state law, including one announced on direct appeal of the challenged

5    conviction, binds a federal court sitting in habeas corpus."  <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76,

6    126 S. Ct. 602, 604 (2005).  For petitioner to be entitled to relief, the jury instructions must be

7    defective in some way.  <u>Waddington</u>, 555 U.S. at 190.  The state court's finding that CALCRIM

8    No. 570 is unambiguous was not objectively unreasonable.  Accordingly, petitioner's claim must

9    be denied.

10    B. <u>Lay Witness Opinion</u>

11    Petitioner contends the trial court committed prejudicial error in admitting the testimony

12    of Detective Murchison that offered an opinion as to the truth of petitioner's confession.

13    Petitioner raised this claim on direct appeal and the state court of appeal concluded that the trial

14    court's admission of Detective Murchison's opinion was harmless error, reasoning as follows:

15
16    > Defendant contends the trial court prejudicially erred in permitting Detective Murchison to give opinion testimony on the veracity of defendant's confession. Finding the error harmless, we disagree.

17
18
19
20
21    > During Detective Murchison's rebuttal testimony, the prosecutor asked whether defendant's testimony was consistent with Ernst's injuries. Defendant objected, claiming lack of foundation, which the trial court overruled. Murchison started to testify that regarding the totality of the evidence concerning Ernst's injuries, "I still just don't understand how," when the trial court stopped him and said, "Let's be mindful that he's not the expert here." The prosecutor then moved to another line of questioning.

22
23
24
25
26    > A little later, the prosecutor elicited from Detective Murchison that defendant's testimony presented information about the attack which he had not heard before. The prosecutor next asked: "And does what she said at trial change your opinion that, based on the evidence, her confession statement to you was accurate." Defense counsel objected, as the question "calls for his conclusion as to her truthfulness. That's for the jury to decide." The trial court overruled the objection, finding the jury would determine whether defendant was truthful, but Murchison could still give his opinion. Murchison then answered, "No, it has not changed."

27
28    > Defendant asserts Detective Murchison's answer was inadmissible opinion evidence. Characterizing the question and answer as "argumentative and irrelevant," defendant concludes the testimony

13

was "extremely prejudicial because they were addressed to a jury of citizens as the word of a public official elicited properly by another public official ... and with the apparent approval of the judge h[er]self."

"Lay opinion about the veracity of particular statements by another is inadmissible on that issue." (*People v. Melton* (1988) 44 Cal.3d 713, 744.) There are several reasons for this rule. "With limited exceptions, the fact finder, not the witnesses, must draw the ultimate inferences from the evidence. Qualified experts may express opinions on issues beyond common understanding [citations], but lay views on veracity do not meet the standards for admission of expert testimony. A lay witness is occasionally permitted to express an ultimate opinion based on his perception, but only where 'helpful to a clear understanding of his testimony' [citation], i.e., where the concrete observations on which the opinion is based cannot otherwise be conveyed. [Citations.] Finally, a lay opinion about the veracity of particular statements does not constitute properly founded character or reputation evidence [citation], nor does it bear on any of the other matters listed by statute as most commonly affecting credibility [citation]. Thus, such an opinion has no 'tendency in reason' to disprove the veracity of the statements." (*Ibid.*)

As the Supreme Court has observed, "a police officer's opinion regarding the truthfulness of a suspect's confession is generally deemed inadmissible." (*People v. Anderson* (1990) 52 Cal.3d 453, 478.) Detective Murchison was not an expert on the veracity of confessions, and it was error for the trial court to allow him to give opinion testimony on whether defendant's confession was truthful. However, the admission of such testimony does not mandate reversal unless defendant can show it is reasonably probable she would have obtained a more favorable outcome had her objection been sustained. (*People v. Melton*, *supra*, 44 Cal.3d at pp. 744–745 [applying harmless error test of *People v. Watson* (1956) 46 Cal.2d 818, 836 to improper question calling for lay opinion testimony about the veracity of another witness].)

During the People's case-in-chief, Detective Murchison testified, without any objection from defendant, that he thought defendant's confession was largely truthful based on numerous corroborating facts such as her detailed description of the murder weapon, her placing the victim in the front seat, and the location of Ernst's body. Defendant's failure to object to this testimony forfeits any contention that it was improperly admitted. (*People v. Anderson*, *supra*, 52 Cal.3d at p. 478.) Any prejudice from the improper opinion testimony on rebuttal is diminished by this earlier testimony.

The case against defendant was overwhelming. Defendant's confession was corroborated by substantial physical evidence, including the considerable amount of blood in the car and the back seat in particular. The lack of defensive wounds on Ernst and the nature of her neck wounds strongly support defendant's confession that she attacked Ernst from behind and slit her throat. By contrast,

1
2
3
4
5

defendant's claim of a mutual struggle that spilled out of the car is inconsistent with the lack of defensive wounds, the extensive wounding on Ernst's neck, and the amount and placement of bloodstains in defendant's car. Her testimony could not readily explain why the unusual murder weapon was in her car on the night of the murder. Defendant's explanation, that it was used to help remove lettering from a door at work, was inconsistent with the coworker's testimony that their employer provided the tools to remove the lettering from the door.

6
7
8
9

The error here consisted of a one-sentence answer by Detective Murchison, that defendant's testimony did not change his previously stated opinion that her confession was truthful. In light of the overwhelming evidence of defendant's guilt and the previous opinion testimony admitted without objection, it is not reasonably likely that the jury would have reached a different result had the trial court sustained defendant's objection.

10   Erends, 2011 WL 2519208, at **6–8.

11          Generally, the admissibility of evidence is a matter of state law, and is not reviewable in a

12   federal habeas corpus proceeding.  Estelle, 502 U.S. at 68, 112 S. Ct. 475, 116 L.Ed.2d 385;

13   Middleton, 768 F.2d at 1085; Henry v. Kernan, 177 F.3d 1152, 1159 (9th Cir.1999) (admission of

14   evidence in a state trial is not subject to federal habeas review unless it violates a specific

15   constitutional right).  However, there can be habeas relief for the admission of prejudicial

16   evidence if the admission was fundamentally unfair and resulted in a denial of due process.

17   Estelle, 502 U.S. at 72–73; Pulley v. Harris, 465 U.S. 37, 41, 104 S. Ct. 871, 79 L.Ed.2d 29

18   (1984); Walters v. Maas, 45 F.3d 1355, 1357 (9th Cir.1995); Jeffries v. Blodgett, 5 F.3d 1180,

19   1192 (9th Cir.1993), cert. denied, 510 U.S. 1191, 114 S. Ct. 1294, 127 L.Ed.2d 647 (1994);

20   Gordon v. Duran, 895 F.2d 610, 613 (9th Cir.1990).  The failure to comply with state rules of

21   evidence alone is neither a necessary nor a sufficient basis for granting federal habeas relief on

22   due process grounds.  Jammal v. Van de Kamp, 926 F.2d 918, 919–920 (9th Cir. 1991).

23          A state court's evidentiary ruling—even if erroneous—is grounds for federal habeas relief

24   only if it renders the state proceedings so fundamentally unfair as to violate due process.  Holley

25   v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009); Jammal v. Van de Kamp, 926 F.2d 918, 919

26   (9th Cir. 1991).  Even so, as the Ninth Circuit has observed:

27
28

The Supreme Court has made very few rulings regarding the admission of evidence as a violation of due process.  Although the Court has been clear that a writ should be issued when

15

1
2
3

> constitutional errors have rendered the trial fundamentally unfair (citation omitted), it has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.

4   Holley, 568 F.3d at 1101.  Therefore, "under AEDPA, even clearly erroneous admissions of

5   evidence that render a trial fundamentally unfair may not permit the grant of federal habeas

6   corpus relief if not forbidden by 'clearly established Federal law,' as laid out by the Supreme

7   Court." Id.  On the basis of these authorities, the state court's rejection of petitioner's due process

8   claim here does not support federal habeas relief under AEDPA because the admission of

9   Detective Murchison's opinion regarding the trustworthiness of petitioner's confession did not

10  violate any clearly established federal law.  See id.  Accordingly, this claim must be denied.

11          C. _Brady_ Claim

12          Petitioner contends the prosecution suppressed toxicology reports that would have helped

13  her defense.  In particular, petitioner contends the prosecution withheld blood test results that

14  show she was under the influence of drugs and other medication when she killed Ernst.  Petitioner

15  raised this claim in a state habeas petition to the superior court.  Resp't's Lod. Doc. 7.  The Placer

16  Superior Court, as more fully discussed below, denied related claims but did not expressly

17  address petitioner's Brady claim.  Resp't's Lod. Doc. 8.  Under Johnson v. Williams, 133 S. Ct.

18  1088, the court will presume that petitioner's Brady claim was adjudicated on the merits, as

19  petitioner has made no effort to rebut that presumption.  See Johnson, 133 S. Ct. at 1096–97.

20          The Supreme Court has found the Due Process Clause of the Fourteenth Amendment

21  requires that, upon request, a criminal defendant be provided by the prosecution with all evidence

22  in their possession which is material to guilt or innocence.  Brady v. Maryland, 373 U.S. 83, 87,

23  83 S. Ct. 1194, 10 L.Ed.2d 215 (1963).  Evidence is material if there is a reasonable probability

24  that, had the evidence been disclosed to the defense, the result of the proceedings would have

25  been different.  U.S. v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 87 L.Ed.2d 481 (1985).  To

26  succeed on a Brady claim, a petitioner must establish that the undisclosed evidence was: (1)

27  favorable to the accused, either as exculpatory or impeachment evidence, (2) suppressed by the

28  prosecution, either willfully or inadvertently, and (3) material, so that prejudice to the defense

resulted from its suppression. <u>Strickler v. Greene</u>, 527 U.S. 263, 281–82, 119 S. Ct. 1936, 144 L.Ed.2d 286 (1999). The reviewing court examines the withheld evidence individually and cumulatively. <u>See Kyles v. Witley</u>, 514 U.S. 419, 436–37 & n. 10, 115 S. Ct. 1555, 131 L.Ed.2d 490.

The accused has suffered prejudice only if the suppression undermines confidence in the outcome of the trial. <u>Benn v. Lambert</u>, 283 F.3d 1040, 1053 (9th Cir.2002) (citing <u>Bagley</u>, 473 U.S. at 676). The mere possibility that an item of undisclosed information might have helped the defense, or might have affected the outcome of the trial, does not establish materiality in the constitutional sense. <u>Barker v. Fleming</u>, 423 F.3d 1085, 1099 (9th Cir. 2005). However, the petitioner need not show that he would more likely than not have been acquitted had the evidence been disclosed. <u>Kyles</u>, 514 U.S. at 434–35. Rather, the touchstone of the inquiry is whether petitioner received a fair trial that resulted in a verdict "worthy of confidence." <u>Id.</u> at 434.

Petitioner contends the toxicology report conducted on blood samples she provided the day she was booked in county jail show the presence of drugs and other medication. To the contrary, pursuant to a stipulation the parties agreed as follows: "It is stipulated that Defendant's blood was taken upon arrest on 3/11/08. A subsequent test for the presence of drugs came back negative." 1 CT 229. Because the toxicology report is not favorable to petitioner's defense, her <u>Brady</u> claim fails.

D. <u>Ineffective Assistance of Counsel</u>

Petitioner also contends counsel was ineffective because trial counsel failed to investigate and present evidence of her diminished capacity. She raised this claim in a state court habeas petition to the Placer County Superior Court[3], which denied her petition as follows:

> Following a jury trial, defendant Stephanie Nicole Erends was convicted of first degree murder (Pen. Code, § 187) with a lying-in-wait special circumstance (*id.*, § 190.2, subd. (a)(15)) and a deadly weapon enhancement (*id.*, § 12022, subd. (b)(1)). The trial court initially sentenced defendant to a state prison term of 25 years to life plus one year, later correcting the sentence to life without the possibility of parole plus one year. On appeal, the petitioner

---

[3] The Placer County Superior Court's opinion on petitioner's state habeas petition is the last reasoned decision on this issue. <u>See</u> Respt' Lod. Docs. 8, 10, 12.

claimed that there was instructional error and inadmissible opinion evidence at trial. The conviction was affirmed by the appellate court on July 16, 2011. On August 29, 2012, the petitioner filed the instant petition for writ of habeas corpus in the Superior Court.

In her petition, petitioner claims, in summary, that her trial counsel was ineffective for not pursuing or investigating the effect of drug ingestion. She claims that she was suffering from "delusions" and was not "competent" to stand trial and her trial counsel did not investigate or present her condition at trial.

However, other than making bare assertions in her pleadings, the petitions [sic] has attached no documentary or other evidence to support her claim that she was mentally incompetent. She lists the names of "witnesses" she claims could testify to her mental condition, but she did not attach any sworn declarations of the witnesses to her petition. No psychological reports or assessments of petition [sic] are attached.

Because a petition for a writ of habeas corpus seeks to collaterally attack a presumptively final criminal judgment, the petitioner bears a heavy burden initially to plead sufficient grounds for relief, and then later to prove them. To satisfy the initial burden of pleading adequate grounds for relief, an application for habeas corpus must be made by petition, and ["][i]f the imprisonment is alleged to be illegal, the petition must also state in what the alleged illegality consists. The petition should both (i) state with particularity the facts on which relief is sought, and (ii) include copies of reasonably available documentary evidence supporting the claim, including pertinent portions of trial transcripts and affidavits or declarations. Conclusory allegations made without any explanation of the basis for the allegations do not warrant relief, let alone an evidentiary hearing.["] (People v. Duval (1995) 9 Cal. 4th 464, at p. 474 [])[.] Vague or conclusory allegations without factual support are insufficient. (In re Swain (1949) 34 Cal.2d 300, 304).

In this case, the Court finds that the Petitioner's bare assertions of mental disease and ineffective assistance of counsel are unsupported conclusory allegations. In addition, the issue of ineffective assistance of counsel was not raise on appeal to the appellate court.

Accordingly, the petition for writ of habeas corpus [is] denied.

(Resp't's Lod Doc. 8.)

The test for demonstrating ineffective assistance of counsel is set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984). First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. Strickland, 466 U.S. at 688. To this end, the petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. Id. at

690. The federal court must then determine whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. Id. "We strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." Hughes v. Borg, 898 F.2d 695, 702 (9th Cir.1990), citing Strickland at 466 U.S. at 689.

Second, a petitioner must affirmatively prove prejudice. Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "That requires a 'substantial,' not just 'conceivable,' likelihood of a different result." Cullen v. Pinholster, 131 S. Ct. 1388, 1403, 179 L.Ed.2d 557 (2011) quoting Richter, 562 U.S., at ----, 131 S. Ct., at 791.

The Supreme Court has emphasized the importance of giving deference to trial counsel's decisions, especially in the AEDPA context:

> In *Strickland* we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 [ ]. Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Ibid.* (quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83[ ] (1955)).
>
> For [petitioner] to succeed, however, he must do more than show that he would have satisfied *Strickland*'s test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied *Strickland* incorrectly. *See Williams*, *supra*, at 411, 323 U.S. 471, 65 S.Ct. 363, 89 L.Ed. 398[ ]. Rather, he must show that the [ ]Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698–699, 122 S. Ct. 1843, 1852, 152 L.Ed.2d 914 (2002).

Petitioner contends that trial counsel failed to fully investigate and present evidence of her diminished capacity. She asserts that trial counsel should have employed a different psychologist

1    than the one used at trial because the one used was not able to perform a complete evaluation on

2    her.  She also states that she had diminished mental capacity and mental health issues which

3    should have been presented to the court.  Petitioner also names potential witnesses who counsel

4    should have contacted and did not.

5          As an initial matter and as noted by the Placer Superior Court, none of these asserted

6    derelictions of duty occurred at the appellate level and none were raised on direct appeal.

7    Resp't's Lod. Doc. 8.  Further, petitioner's claim fails because she did not set forth what a

8    different psychologist might have said, or what additional time with Dr. Ari Kalechstein, the

9    psychologist who evaluated petitioner and testified on her behalf, might have provided.  Dr.

10   Kalechstein stated that he interviewed petitioner on two separate days for a total of eight to ten

11   hours.  5 RT 1327.  He also testified that he reviewed records related to petitioner's case which

12   included crime reports, police interviews with petitioner, letters prepared by petitioner and a

13   toxicology screen of Alicia Ernst.  Id.  He testified that he believed petitioner was under the

14   influence of methamphetamine when she killed Alicia Ernst.  5 RT 1348.  Despite having limited

15   time with petitioner, Dr. Kalechstein testified that he believed he had sufficient information and

16   time with petitioner to form the opinions he made.   5 RT 1364.  Contrary to petitioner's

17   assertions that Dr. Kalechstein could not provide a diagnosis and that trial counsel failed to

18   present her mental health issues to the court, Dr. Kalechstein opined that petitioner suffered from

19   major depressive disorder and posttraumatic stress disorder and generally testified regarding the

20   effects of methamphetamine use, major depressive disorder and posttraumatic stress disorder.  5

21   RT 1329–46, 1353, 1357.

22         Further, petitioner failed to explain what the witnesses who were housed with her in

23   county jail would have said regarding her mental health issues.  She did not attach any

24   declarations shedding light on this information.  The state superior court reasonably concluded

25   that petitioner's ineffective assistance of counsel claim was based on unsubstantiated, conclusory

26   allegations.  Accordingly, the state court's determination of petitioner's ineffective assistance of

27   counsel claim was not an unreasonable application of Strickland.  This claim must be denied.

28   / / /

III.     Certificate of Appealability

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant.  A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitution right."  28 U.S.C. § 2253(c)(2).  For the reasons set forth in this Order, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY ORDERED that:

1.  The second amended petition for writ of habeas corpus (ECF No. 20) is denied;

2.  This case be closed; and

3.  The court declines to issue the certificate of appealability referenced in 28 U.S.C. § 2253.

Dated:  January 22, 2015

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

10 / eren2603.hc

21